FILED

2015 Mar-16  PM 03:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY HALEY-MUHAMMAD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 5:13-CV-2061-CLS** |
| **vs.** | ) | |
| | ) | |
| **COLONIAL MANAGEMENT GROUP, LP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action was jointly commenced by Kimberly Haley-Muhammad and Deborah L. Rhynes against their former employer, Colonial Management Group, LP. Their joint complaint alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and 42 U.S.C. § 1981.[1] This court severed the claims of Deborah L. Rhynes from those of Kimberly Haley-Muhammad in a memorandum opinion and order entered on August 26, 2014.[2] Kimberly Haley-Muhammad then filed an amended complaint, asserting claims of race discrimination and a racially hostile work environment under Title VII and § 1981, and retaliation

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 23 (Memorandum Opinion and Order).

under the FMLA.[3]  The case presently is before the court on defendant's motion for summary judgment.[4]   Upon consideration of the pleadings, briefs, evidentiary submissions, and oral arguments of counsel, this court concludes that the motion should be granted.

## I. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is

---

[3] Doc. no. 24 (Amended Complaint).

[4] Doc. no. 33.

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case. The relevant rules of substantive law dictate the
> materiality of a disputed fact. A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration

supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251–52 (1986)

(asking "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law").

## II.  SUMMARY OF FACTS

Defendant, Colonial Management Group, LP ("Colonial"), operates methadone

treatment centers throughout the United States.[5] Plaintiff, Kimberly Haley-

Muhammad, is an African-American. She was hired by Colonial in November of

2002, to work as a Treatment Services Coordinator in the company's Huntsville

Metro Treatment Center ("Huntsville Metro").[6]

---

[5] Doc. no. 35-6 (Hamer Deposition), at 24.

[6] Doc. no. 24 (Amended Complaint), ¶ 4.

3

## A.   Plaintiff's Employment as a Treatment Services Coordinator

Plaintiff worked as a Treatment Services Coordinator at Huntsville Metro from November of 2002 to July of 2011, during which time she was supervised by Program Director Steve Flora.[7]  Flora, who is white, often discouraged his African-American employees from taking leave, but he rarely discouraged his white employees from doing so.[8]  Plaintiff lodged a complaint in 2010 with Flora's supervisor, Regional Director Susan Case, alleging that Flora was creating a "hostile work environment" by "screaming, hollering, [and] cursing" at his employees.[9]  Colonial conducted an investigation into plaintiff's complaint, terminated Flora's employment, and gave him $8,335.68 in severance pay.[10]

## B.   Plaintiff's Promotion to Program Director

Regional Director Susan Case, who is white, promoted plaintiff to the position formerly held by Steve Flora, Program Director of Huntsville Metro, in July of 2011.[11]  As Program Director, plaintiff managed the daily operations of Huntsville

---

[7] Doc. no. 35-2 (Plaintiff's Deposition), at 55–56, 192–93.

[8] *Id.* at 197.

[9] *Id.* at 102–04 (alteration supplied).  Plaintiff testified that Flora never used any kind of racial slur or made any sexually offensive comments.  *Id.* at 103.  She also testified that Flora screamed at both African-American and white employees.  *Id.* at 105–06.

[10] *Id.* at 107; doc. no. 35-7 (Defendant's Answers to Interrogatories), ¶ 6.

[11] Doc. no. 35-2 (Plaintiff's Deposition), at 56.

4

Metro and supervised its medical and clinical staff.[12]  Regional Director Susan Case served as plaintiff's direct supervisor from July of 2011 until Case stepped down from her position in May of 2012.[13]

### 1.    Plaintiff's training while under Susan Case's supervision

As plaintiff's supervisor, Susan Case was responsible for training plaintiff on her duties as the Program Director of Huntsville Metro:  duties that included ensuring that the treatment center prepared for and passed inspections conducted by the Alabama Department of Mental Health.[14]

When the State of Alabama changed its mandated patient assessment procedures during August of 2011, plaintiff asked Case to train her on the changes.[15] Case refused to do so, however, and instead told plaintiff to "[j]ust do it."[16]  On the other hand, Case *did* provide such training to Brent Hamer, the white Program Director of a Colonial treatment center in Birmingham.[17]

After being denied training by Case, plaintiff worked with her staff to research the new requirements, but "in the middle of training . . . Susan Case told [plaintiff]

---

[12] *Id.* at 57.

[13] *Id.* at 60; doc. no. 35-6 (Hamer Deposition), at 20.

[14] Doc. no. 35-2 (Plaintiff's Deposition), at 114.

[15] *Id.* at 67–68.

[16] *Id.* (alteration supplied).

[17] *Id.* at 61.

to stop; that it was not correct."[18]   Plaintiff continued to ask Case for training from

December of 2011 to May of 2012, but Case instructed plaintiff to wait until October

1, 2012, when the State would provide further instructions.[19]   Significantly, however,

the State's inspection of Huntsville Metro was set to occur five months earlier, in

May of 2012.[20]   Plaintiff lodged a verbal complaint with Colonial's Director of

Human Resources, Kristin Hilton, in May of 2012, alleging that she had not been

trained to implement changes in patient assessment procedures.[21]   Notably, plaintiff

did not mention race discrimination in her complaint.[22]

## 2.   Racial remarks while plaintiff was under Susan Case's supervision

Sometime during 2011, Regional Director Susan Case decided to hire a new

Treatment Services Coordinator for Huntsville Metro.[23]   Two of Case's top three

choices for the position were African-American, and the other was white.[24]   Case

hired an African-American, Anthony Ardis, for the position.[25]

During the hiring process, however, Case stated in a "high tone" to plaintiff

---

[18] *Id.* at 68 (alteration supplied).

[19] *Id.* at 69.

[20] Doc. no. 35-2 (Plaintiff's Deposition), at 114–117.

[21] *Id.* at 71.

[22] *Id.* at 110.

[23] *Id.* at 72.

[24] *Id.*

[25] *Id.*

that it was against Colonial policy "to have all African-American management," because "the management team had to match the [patient] population."[26]  The patient population of the Huntsville Metro Treatment Center is 90 percent white.[27]   Case testified in an affidavit that the Commission on Accreditation of Rehabilitation Facilities conducted an audit of Huntsville Metro in September of 2011, and "determined that the staff did not match the clinic population, as the management and most of the staff were African-American, and the patient population was predominately White."[28]   The "Opioid Treatment Program Standards Manual" produced by the Commission states that treatment centers must demonstrate cultural competency: a benchmark that is accomplished, at least in part, "by hiring persons who are representative of the persons served."[29]

Case frequently engaged in "screaming matches" with plaintiff.[30]   On one occasion, she told plaintiff: "Just do as I tell you to do, *you and your people* are just being stubborn, just do it."[31]  Plaintiff testified that she never complained that Case's reference to "you and your people" was either racist or offensive because she "feared

---

[26] Doc. no. 35-2 (Plaintiff's Deposition), at 80 (alteration supplied).

[27] *Id.* at 81.

[28] Doc. no. 35-5 (Case Affidavit), ¶ 8.

[29] Doc. no. 35-9 (CARF Standards Manual), at 33.

[30] Doc. no. 35-2 (Plaintiff's Deposition), at 199.

[31] *Id.* at 200 (emphasis supplied).

for [her] job."[32]

Susan Case stepped down from her position as Regional Director in May of 2012, and Colonial hired Brent Hamer to replace her.[33]  Hamer had served as the Program Director for one of Colonial's treatment centers in Birmingham for eleven years before his promotion.[34]  Colonial did not post the job opening, however, so plaintiff did not have an opportunity to apply for it.[35]

## C.    FMLA Leave

Plaintiff took FMLA leave from June 4 to July 17, 2012, during which time Regional Director Brent Hamer "was in charge" of Huntsville Metro.[36]

Director of Human Resources Kristin Hilton visited Huntsville Metro on June 27, 2012, while plaintiff was on leave.[37]  During her visit, Hilton discovered that disciplinary notices had been issued to two lower-level employees by one of the center's Treatment Services Coordinators on September 28, 2011:  *i.e.*, during the year prior to plaintiff's FMLA leave.[38]  According to Colonial policy, however,

---

[32] *Id.* at 206 (alteration supplied).

[33] Case became the Program Director at Colonial's Mobile treatment center in May of 2012. She was terminated in October of 2013 and given $9,507.68 in severance pay.  Doc. no. 35-6 (Hamer Deposition), at 18–19; doc. no. 35-7 (Defendant's Responses to Interrogatories), ¶ 6.

[34] Doc. no. 35-6 (Hamer Deposition), at 12.

[35] Doc. no. 35-2 (Plaintiff's Deposition), at 213.

[36] *Id.* at 125.

[37] *Id.* at

[38] Doc. no. 35-6 (Hamer Deposition), at 31–32; doc. no. 35-8 (Final Warning).

8

disciplinary notices may be issued only by a Program Director.  Therefore, Kristin

Hilton issued the following "Final Warning" to plaintiff on July 15, 2012, two days

before plaintiff returned to work:[39]

> The [disciplinary notices] were presented on September 28, 2011 by the Treatment Services Coordinator[,] which resulted in miscommunication of the situation.  As a result[,] two Equal Employment Opportunity Commission charges were filed.  During the investigation of the charges and in the months leading up to mediation on April 3, 2012[,] at no time did Ms. [Haley-Muhammad] divulge to the Director of Human Resources that she did not present the documentation.  The information could have resulted in an additional financial loss to the organization.  The progressive discipline actions must be presented by Program Directors as they are trained in disciplinary procedures.
>
> Ms. [Haley-Muhammad's] actions are a dereliction of duty and did result in a financial loss to the organization.  Ms. [Haley-Muhammad] observed poor judgment and failed to follow the correct course of action as stated in the [Colonial Policy and Procedure Manual].
>
> Ms. [Haley-Muhammad's] actions are in violation of [three sections of the Policy and Procedure Manual:] "Unprofessional behavior to patients, co-workers or vendors"; "Inability, negligence or unwillingness to perform assigned work or maintain expected performance levels; poor performance"; and, "Insubordination, including inability to work amicably with supervisor or fellow team members (poor attitude) as well as refusal to perform tasks assigned by a supervisor."

---

[39] Hilton made the decision to discipline plaintiff, *see* doc. no. 35-6 (Hamer Deposition), at 31, but the Final Warning was presented to plaintiff by Brent Hamer on July 19, 2012 — *i.e.*, two days after plaintiff returned from leave.  *See* doc. no.  35-2 (Plaintiff's Deposition), at 165.

9

Action Plan for Improvement:

> Ms. [Haley-Muhammad] will make sure that she is following the proper procedures at all times.  Ms. [Haley-Muhammad] will review the Policy and Procedure Manual and direct any questions or concerns to the Regional Director and/or the Corporate Office.   Any other policy violations will result in further disciplinary action, up to and including separation of employment[.]

Doc. no. 35-8 (Final Warning) (alterations supplied).  Plaintiff believed the "Final Warning" to be unfair.  Not only was it the first discipline she had received during her ten years of employment with Colonial,[40] but on September 28, 2011 — the date on which the disciplinary notices had been issued — plaintiff was on vacation, and her direct supervisor (Susan Case) had instructed the Treatment Services Coordinator to issue the notices.[41]  Regardless of the fairness of those circumstances, there is no evidence that the warning was motivated by a racist animus.  Further, no tangible consequences attached to it, either on the date of its issuance or subsequently.

D.     **Drug Enforcement Administration Audit**

Two Drug Enforcement Administration ("DEA") investigators conducted an audit of Huntsville Metro treatment records on June 26, 2012.  Their investigation covered the quarterly period from March 26 through June 26, 2012,[42] and revealed

---

[40] *See* doc. no. 24 (Amended Complaint), ¶ 9.

[41] *See* doc. no. 35-2 (Plaintiff's Deposition), at 167–68, 182–83.

[42] Plaintiff was on FMLA leave for 23 days of this 93-day period.

both "a significant shortage of Methadone" in the center's inventory, and a failure "to account for and properly maintain records of approximately 3,423 milligrams or dosage units of methadone."[43]   Colonial was informed by the U.S. Department of Justice in a subsequent e-mail, dated August 2, 2012, that the DEA investigation had revealed:

1.   158 violations of 21 C.F.R. § 1305.13(b), failure to accurately and fully complete DEA Form 222. . . .

2.   10 violations of 21 C.F.R. § 1305(d), failure to send Copy 2 of DEA Form 222 to the DEA Special Agent in Charge for the area in which the supplier is located. . . .

3.   365 violations of 21 C.F.R. § 1305.17(c), failure to maintain its original Copy 3 of DEA Form 222 separate from other documents.   The investigation revealed that [Huntsville Metro] commingled the original DEA Form 222 with other documents.

4.   1 violation of 21 C.F.R. § 1304.21(a).  General failure to maintain complete and accurate records.  The DEA's inspection revealed an overall careless and haphazard record-keeping practice at [Huntsville Metro]. . . .

---

[43] Doc. no. 35-8 (E-mail from U.S. Department of Justice), at ECF 2.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically. *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009). Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header." *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

11

As you are aware, [Huntsville Metro] is one of several treatment centers owned/operated by the Colonial Management Group in Alabama. All of the Alabama Treatment Centers operate under the same management structure. According to DEA records, record maintenance violations appear to be a systemic problem with Colonial's Alabama facilities. In light of the DEA's prior warnings and efforts, including a notice of admonishment in 2010, [Huntsville Metro's] violations are highly egregious and evidence a complete disregard for its statutory and regulatory obligations.

. . .

[Huntsville Metro] is thus potentially subject to civil penalties that may amount to millions of dollars. Our office is prepared to institute proceedings for the civil prosecution of [Huntsville Metro's] violations.

Doc. no. 35-11 (E-mail from U.S. Department of Justice), at ECF 2–3 (alterations supplied). Colonial was fined $1.8 Million dollars as a result of the audit.[44] Even though the "deficiencies" in the DEA audit were attributable in the first instance to a nurse at Huntsville Metro, Regional Director Brent Hamer held plaintiff responsible because, as Program Director, she ultimately was responsible for all record-keeping and training of medical personnel.[45]

## E.     Alabama Department of Mental Health Inspection

The Alabama Department of Mental Health's "Methadone Authority" inspected Huntsville Metro between May 15 and 17, 2012 — *i.e.*, two weeks before plaintiff's

---

[44] Doc. no. 35-6 (Hamer Deposition), at 57–60.

[45] *Id.*

June 4 through July 17 FMLA leave began.[46]   The Department communicated the

results of the inspection to Colonial in the following letter dated July 27, 2012 — ten

days after plaintiff returned to work:

> The site visit of [Huntsville Metro] revealed that your agency is not in substantial compliance with Alabama Department of Mental Health standards.   As a result of the review findings, effective immediately your agency . . . is placed on a sixty (60) day **Provisional** certification status.  This certification will expire September 25, 2012.
>
> A **Plan of Action** to address noted deficiencies in the site visit report is due to the Office of Certification Administration within thirty (30) days from receipt of this letter.  Failure to submit the Plan of Action within the time period specified may result in immediate decertification of your programs.  Prior to the expiration of Provisional Certification status your programs will undergo a complete site certification review. Further certification of those programs will be determined by the outcome of that review.

Doc. no. 35-10 (Department of Mental Health Site Report), at ECF 2 (alteration

supplied, emphasis in original).

Brent Hamer told plaintiff that he would handle the "plan of action" required

by the Department of Mental Health.[47]  Plaintiff sent Hamer a text message on August

15, 2012, reminding him to complete and submit the plan.[48]  It appears that the plan

---

[46] Doc. no. 35-2 (Plaintiff's Deposition), at 115–17.

[47] *Id.* at 130.

[48] *Id.* at 132.

of action was timely submitted.[49]

The Alabama Department of Mental Health returned to Huntsville Metro on September 25, 2012, for the purpose of conducting its follow-up inspection, and determined that many of the deficiencies still had not been corrected:

> This was a follow-up review of the previous provisional score awarded to Huntsville Metro Treatment Center May 15–17, 2012. Most administrative issues were either resolved or a plan was in place to correct them. Reviewers found little progress as evidenced by staff interviews, client interviews[,] and review of clinical documentation that programmatic issues were being addressed. Many of the same clinical issues previously [c]ited remain uncorrected.

Doc. no. 35-12 (Second Inspection Report), at ECF 4 (alterations supplied).

Huntsville Metro was granted another 60-day provisional certification on December 19, 2012.[50]

## F.    Termination

Colonial terminated plaintiff's employment on September 26, 2012, the day after the State's follow-up inspection.[51]  Regional Director Brent Hamer, Director of Human Resources Kristin Hilton, and Assistant Director of Human Resources Natasha McGrath made the decision to terminate plaintiff's employment.[52]  Plaintiff

---

[49] *See* doc. no. 35-6 (Hamer Deposition), at 49 (explaining that plaintiff "was given an opportunity and an action plan to correct findings from the first State audit.").

[50] Doc. no. 35-12 (Second Inspection Report), at ECF 2.

[51] *See* doc. no. 35-2 (Plaintiff's Deposition), at 185.

[52] Doc. no. 35-7 (Defendant's Answers to Interrogatories), ¶ 1.

received the following termination notice:

List of previous warnings and type(s) of corrective action(s):

07/18/2012 - Verbal discussion regarding State of Alabama findings[.]

07/15/2012 - Final Warning (Policy Violation, Insubordination, Work Quality & Productivity).

Summary of Unacceptable Behavior:

On 09/25/2012 a State of Alabama Methadone Authority inspection revealed that Ms. Kimberly Haley[-Muhammad], Program Director of Huntsville Metro Clinic had not addressed or corrected violations noted during the 60 day provision license issued in May 2012.

Alabama State inspection violations found in May 2012:

1.  [Tuberculosis] Skin Test record[s] were missing for employees.

2.  Pharmacy variance and incident reports not sent to State of Alabama.

3.  [Newly-mandated patient assessments] incomplete.

4.  Lack of new counselors being oriented to their job description/training.

5.  Lack of Administrative/Clinical supervision as a treatment team.

6.  Treatment plans not individualized or completed within 24 hours.

7.  Patients admitted prior to completion of [newly-mandated

patient] assessments.

[8.]   Poor quality of clinical documentation.

[9.]   Treatment planning not an ongoing process in the patient's treatment.

[10.]   Missing signatures on case notes and assessments.

After the May inspection when the State gave [Huntsville Metro] a conditional license for non-compliance with state regulations, a written list of items that needed to be corrected was provided.  Mr. Brent Hamer . . . discussed with Ms. Kimberly Haley[-Muhammad] this list of action items and steps to correct them within the 60 day time frame.  These items were to be implemented immediately in order to bring the Huntsville Metro Clinic into compliance based upon Alabama State Methadone Authority violations found during the inspection.

As Program Director, Ms. Kimberly Haley[-Muhammad] is responsible to ensure compliance with all local, state, federal, and Colonial Management Group, LP rules, regulations, and policies.  Also, Ms. Haley[-Muhammad] is to provide administrative and clinical supervision and direct and monitor all clinic staff in the performance of their duties.

During the follow-up State inspection on 09/25/2012 it was determined that a majority of the violations had not been corrected, nor had any effort been made to bring the Huntsville Metro Clinic into full compliance during the 60 day provisional time allowed.

Ms. Haley[-Muhammad's] actions are a violation of [Colonial] Policy and Procedures, Section 6, Zero Tolerance Policies, "Prohibited Behavior," #3 Inability, negligence, or unwillingness to perform assigned work or maintain expected performance levels; poor performance. #4 Insubordination, refusal to perform tasks assigned by a supervisor; #6 Failure to adhere to [Colonial's] policies or procedures[.]

16

> Despite the clear and explicit instructions provided by Mr. Brent Hamer . . . Ms. Haley[-Muhammad] failed to properly perform those responsibilities that are part of her job responsibilities resulting in an additional extension of the conditional license to correct violations. Due to Ms. Haley[-Muhammad's] failure to adequately manage the Huntsville Metro Treatment Center clinical staff and pharmacy operations her employment will be separated immediately.

Doc. no. 35-13 (Termination Notice), at ECF 2–3 (alterations supplied). Plaintiff received no severance pay.[53]

Following her termination, plaintiff lodged a complaint of discrimination with Colonial, but Colonial took no action on that complaint.[54]

## G. Equal Employment Opportunity Commission Charge and Dismissal

Plaintiff filed a formal "Charge of Discrimination" with the Equal Employment Opportunity Commission on October 18, 2012.[55] The agency issued a "Dismissal and Notice of Rights" on August 19th of the following year, stating that it had terminated its investigation of her charge because it was unable to conclude that the information obtained established violations of the civil rights statutes.[56] That document notified plaintiff of her right to file suit, and this action followed.

### III. CLAIMS ABANDONED BY PLAINTIFF

---

[53] Doc. no. 24 (Amended Complaint), ¶ 14.

[54] *Id.* ¶ 15.

[55] Doc. no. 24-1 (EEOC Charge).

[56] Doc. no. 24-1 (Dismissal and Notice of Rights).

Plaintiff's counsel acknowledged during oral argument that plaintiff had abandoned her claim for a race-based hostile work environment, as well as any claim for interference with her rights under the FMLA.  Accordingly, summary judgment is due to be granted in favor of defendant on those claims.

In addition, defendant's counsel noted during oral argument that plaintiff's amended complaint could be read as asserting claims for a discriminatory failure to promote, discriminatory discipline, and a discriminatory failure to train, but plaintiff did not include any argument supporting such claims in the brief submitted in opposition to summary judgment.   Significantly, however, plaintiff's counsel conceded during oral argument that plaintiff was not asserting such claims independently.  Instead, he stated that evidence that might support such claims was included in the amended complaint and briefing merely to demonstrate Colonial's discriminatory motives in terminating plaintiff's employment.  Accordingly, to the extent that plaintiff's amended complaint can be read as asserting claims for a discriminatory failure to promote, discriminatory discipline, and a discriminatory failure to train, summary judgment is due to be granted in favor of defendant on such claims.

## IV.  FMLA RETALIATION

Plaintiff claims that Colonial terminated her employment in retaliation for her

act of taking leave under the Family and Medical Leave Act of 1993 ("FMLA").[57] Under the FMLA, an eligible employee is entitled to as much as twelve weeks of leave each year to care for a serious health condition of the employee, or the employee's child, spouse, or parent. *See* 29 U.S.C. § 2612(a)(1). Congress declared it "unlawful for any employer to interfere with, restrain, or deny the exercise of[,] or the attempt to exercise, any right provided under this subchapter [of the FMLA]." 29 U.S.C. § 2615(a)(1) (alterations supplied). In addition, employers are "prohibited from discriminating against employees . . . who have used FMLA leave." 29 C.F.R. § 825.220(c).

To prove that an employer retaliated against an employee who exercised her statutory right to FMLA leave, the plaintiff must show that her employer *intentionally* discriminated against her for exercising an FMLA right. *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008). When, as here, there is no direct evidence of a retaliatory animus, courts employ the burden-shifting analytical framework initially articulated in the context of a claim premised upon Title VII of the Civil Rights Act of 1964 by the Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). In the first stage

---

[57] Doc. no. 24 (Amended Complaint), ¶ 26.

of that analysis, the plaintiff must establish a *prima facie* case of retaliation by demonstrating that: she engaged in activity protected by the FMLA; she suffered an adverse employment action; and there is a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). If the plaintiff does so, the employer then must offer a legitimate, non-retaliatory reason for the adverse employment action. *Cf. Holified v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). If the employer does so, the plaintiff then bears the ultimate burden of demonstrating that the employer's stated reason is merely a pretextual excuse for retaliation. *Id.*

The plaintiff in the present action satisfies the first two elements of the *prima facie* case because she took FMLA leave and was terminated. Even so, defendant contends that there is no causal connection between the two events.[58] Plaintiff was terminated just two months after the end of her FMLA leave, however, and such a "close temporal proximity between the two . . . is more than sufficient to create a genuine issue of material fact of causal connection." *Martin*, 543 F.3d at 1268. Accordingly, this court concludes that plaintiff has established a *prima facie* case of FMLA retaliation.

Colonial articulated two primary reasons for its decision to terminate plaintiff's

---

[58] Doc. no. 34 (Summary Judgment Brief), at 34.

employment: *i.e.*, her failure to ensure that the Huntsville Metro methadone treatment center passed the Alabama Department of Mental Health's follow-up inspection; and Huntsville Metro's failure of the DEA audit.[59]   Accordingly, Colonial met its burden of stating legitimate, non-discriminatory reasons for terminating plaintiff.

In order to show that an employer's stated reasons are merely a pretext for discrimination, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotation marks omitted); *see also, e.g.*, *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997); *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994).

Additionally, the Eleventh Circuit held in an *en banc* opinion that, in order to survive summary judgment, an employee must show that *each* of the employer's stated reasons for the adverse employment action is pretextual.   *Chapman v. AI Transport*, 229 F.3d 1012, 1024–25 (11th Cir. 2000) (*en banc*); *see also id.* at 1049 (Birch, J., dissenting) ("As a general rule, I agree with the [majority's holding] that,

---

[59] *Id.*

where an employer offers multiple legitimate, nondiscriminatory reasons for its challenged action, the employee must proffer evidence that shows pretext as to *each* of the proffered reasons.") (alteration supplied, emphasis in original).

Plaintiff asserted that Colonial's first stated reason for her termination — *i.e.*, her failure to ensure that Huntsville Metro passed the follow-up inspection — is pretextual because two white Program Directors in a Minnesota clinic were not disciplined after their treatment center failed a state inspection and had its license revoked.[60]   Even so, during oral argument, plaintiff's counsel acknowledged a lack of evidence establishing that the Minnesota Program Directors, or the circumstances of their misconduct, were comparable to plaintiff.   Absent such evidence, the court cannot conclude that Colonial's decision not to discipline the two alleged comparators is evidence of pretext.  *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir. 2008) (holding that a plaintiff can demonstrate pretext using comparator evidence only if the plaintiff and the comparator "are involved in or accused of the same or similar conduct and are disciplined in different ways").

Plaintiff also has failed to demonstrate pretext as to the second reason for discharge stated by Colonial:  *i.e.*, Huntsville Metro's failure of the DEA audit. Plaintiff contends that this reason is merely a pretext for discrimination because

---

[60] Doc. no. 35-2 (Plaintiff's Deposition), at 150–51.

Colonial did not discipline the nurse whose improper handling of paperwork resulted in the regulatory violations found by the DEA.[61]  The Huntsville Metro nurse is not a proper comparator, however, because plaintiff was her supervisor.  It is completely within the purview of the employer to decide who among its employees within a chain of command should be held responsible for a failure.  *Cf. Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399 (7th Cir. 1997) (holding that "a superior officer's desire to shift blame to a hapless subordinate" is "non-actionable" under Title VII) (cited favorably for that holding by *Alvarez*, 610 F.3d at 1267).  To find otherwise would be to effectively force employers to either discipline all employees within a chain of command, or none at all, or face liability for discrimination or retaliation.  *See Chapman*, 229 F.3d at 1030 (warning courts not to reexamine an employer's business decisions).

Plaintiff next contends that she was "not present to address the DEA audit" because she was on FMLA leave.[62]  Although plaintiff did not elaborate further, she appears to suggest that she should not have been held responsible for the results of the audit because she was not present when it occurred.  The court notes, however, that plaintiff was on FMLA leave for only approximately one third of the period

---

[61] Doc. no. 37 (Plaintiff's Response), at 12.

[62] *Id.*

included in the audit.[63]  Additionally, it appears that plaintiff is merely questioning the fairness of Colonial's decision to hold her responsible for Huntsville Metro's failure of the DEA audit.  As the Eleventh Circuit has emphatically repeated, however, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," the courts do not interfere.  *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Alvarez*, 610 F.3d at 1266 ("The question is whether [plaintiff's] employers were dissatisfied with her for these or other non-discriminatory reasons, *even if mistakenly or unfairly so*, or instead merely used those complaints about [plaintiff] as cover for discriminating against her.") (alterations and emphasis supplied)

Regional Director Brent Hamer testified that only plaintiff was disciplined for Huntsville Metro's failure of the DEA audit because "the Program Director is responsible for all recordkeeping . . . [a]nd training of the medical personnel."[64] Plaintiff may argue that she was not solely responsible for Huntsville Metro's failure of the DEA audit, especially considering she was on leave at the time it was

---

[63] *See supra* Part II.E.

[64] Doc. no. 35-6 (Hamer Deposition), at 59 (alteration supplied).

conducted.  She also may argue that other employees were more deserving of discipline than she.  Nevertheless, she has not cast any doubt on whether Colonial "in good faith *believed*" that plaintiff, as Huntsville Metro's only Program Director, was *ultimately* responsible for record-keeping and training of medical personnel at the treatment center.  *Id.* (emphasis in original).

Accordingly, summary judgment is due to be entered in favor of defendant on plaintiff's FMLA retaliation claim.

## V.  DENIAL OF SEVERANCE PAY

Plaintiff contends that Colonial's refusal to pay her a severance allowance was discriminatory, and in violation of Title VII and § 1981.[65]  Applying the burden-shifting analytical framework articulated in *McDonnell Douglas* and *Burdine* to evaluate plaintiff's circumstantial evidence, this court first looks to whether the plaintiff has established a *prima facie* case of discrimination.  Plaintiff has pointed to four comparators to establish her *prima facie* case:  Steve Flora, Joshua Howell, Anna Conyers, and Karen Pinion-Moore.[66]  Howell, Conyers, and Pinion-Moore were not Program Directors when they were terminated, however, and are not suitable

---

[65] Doc. no. 24 (Amended Complaint), ¶ 14.

[66] *Id.*

comparators.[67]  *See, e.g.*, *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (holding that comparators must be "similarly situated *in all relevant respects*") (emphasis supplied).  Defendant contends that Flora also is not a suitable comparator because the circumstances of his termination were not similar to those of plaintiff.[68]  Plaintiff offers no rebuttal to that contention.  This court concludes Flora is not sufficiently similarly-situated to plaintiff to establish a *prima facie* case of discrimination with regard to severance pay.  *See id.*

Accordingly, summary judgment is due to be entered in favor of Colonial on Plaintiff's denial of severance claim.

## VI.  TERMINATION BECAUSE OF PLAINTIFF'S RACE

Plaintiff alleges that defendant terminated her employment because of her race and skin color, in violation of Title VII and § 1981.[69]  Again, when there is no direct evidence of discrimination, courts employ the burden-shifting analytical framework articulated in *McDonnell Douglas* and *Burdine* to evaluate a plaintiff's circumstantial evidence of discrimination.[70]  Once the plaintiff has established a *prima facie* case of

---

[67] Doc. no. 34 (Summary Judgment Brief), at 18–19, ¶¶ 89–91; doc. no. 37 (Plaintiff's Response), at 4–5.

[68] Doc. no. 34 (Summary Judgment Brief), at 26–27.  *See also supra* Part II.A.

[69] Doc. no. 24 (Amended Complaint), ¶ 19.

[70] Plaintiff testified in her deposition that Colonial has a policy which requires management of each of Colonial's treatment centers to reflect the racial composition of its patients, and that Susan Case told plaintiff that it was against Colonial policy to have a management team composed solely

26

discrimination, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment action. *Holified*, 115 F.3d at 1566. If the employer does so, the plaintiff then bears the burden of demonstrating that the employer's stated reason is merely a pretextual excuse for discrimination. *Id.*

The court need not decide whether plaintiff has established a *prima facie* case of discrimination, however, because it already has concluded that plaintiff has not shown that *both* of Colonial's stated reasons for terminating her employment were pretextual. Accordingly, summary judgment is due to be entered in favor of Colonial on plaintiff's discriminatory termination claim.

## VII. RACE-BASED WAGE DISCRIMINATION

Courts also employ the burden-shifting analytical framework articulated in *McDonnell Douglas* and *Burdine* to evaluate a plaintiff's circumstantial evidence of wage discrimination. *See, e.g.*, *Cooper v. Southern Co.*, 390 F.3d 695, 734–35 (11th

---

of African-Americans. *See supra* Part II.C.2. Plaintiff did not contend in her brief that either the policy or Case's comment was direct evidence of discrimination. *See* doc. no. 37 (Plaintiff's Response). Even so, the court is compelled to note that evidence must meet a "rigorous standard" before it can be considered direct evidence of discrimination. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999). "As a result, only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] will constitute direct evidence of discrimination." *Id.* (alteration supplied). Plaintiff's evidence does not meet this rigorous standard. *See Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393–94 (11th Cir. 1997) (holding that employer's statement that "too many women filled" a certain position was not direct evidence of the employer's discriminatory motive in terminating female plaintiff).

Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  To establish a *prima facie* case of race-based wage discrimination, a plaintiff must show that she belongs to a protected class; similarly-situated comparators outside her protected class received higher wages; and, she was qualified to receive the higher wages.  *Id.*

Plaintiff has identified three white Program Directors employed by Colonial who received higher pay than she: Steve Flora, Terry Mitchell, and Brent Hamer.[71] The court will assume, for the sake of discussion, that plaintiff has established a *prima facie* case of wage discrimination.

Colonial contends that it paid Steve Flora a higher salary because he held the dual position of Regional Director/Assistant Director of Compliance prior to becoming the Program Director at Huntsville Metro, and Colonial "maintained him at the same pay rate" when he became a Program Director.[72]  Colonial also contends that it offered Mitchell a higher salary as a recruitment strategy after Mitchell initially refused the position of Program Director.[73]  The company further contends that Hamer was paid a higher salary "because of his multiple years of experience in the

---

[71] Doc. no. 24 (Amended Complaint).

[72] Doc. no. 34 (Summary Judgment Brief), at 6, ¶¶ 23–24.

[73] *Id.* at 6, ¶ 27–28.

position."[74]  Colonial met its burden of articulating legitimate, non-discriminatory reasons for paying Flora, Mitchell, and Hamer more than plaintiff.

Plaintiff's brief contained no pretext arguments concerning Colonial's stated reasons for paying Flora, Mitchell, and Hamer higher salaries.[75]  Even so, she offered some pretext arguments in her deposition testimony:

> Q.     . . . [W]hy is it that you think you were paid less?
>
> A.     Because of the credentials and the lack of experience.  I had management experience as a Treatment Services Coordinator, and I have a Master's degree, which is a requirement, a state requirement to have a Master's degree to be a Program Director in the State of Alabama, with three years [of post-graduate coursework].
>
> Q.     And are you saying [Flora and Hamer] didn't have that?
>
> A.     No, they did not.

Doc. no. 35-2 (Plaintiff's Deposition), at 93–94 (alterations supplied).  Plaintiff also testified in her deposition that when she asked to be paid the same salary Flora was paid, Susan Case responded, "I cannot give you a 21 percent raise."[76]

Plaintiff's pretext arguments fail to "meet [defendants'] reason[s] head on and rebut [them]."  *Chapman*, 229 F.3d at 1030 (alterations supplied).  Plaintiff does not address Flora's former positions at Colonial, Mitchell's recruitment process, or

---

[74] *Id.* at 25.

[75] *See* doc. no. 37 (Plaintiff's Response).

[76] Doc. no. 35-2 (Plaintiff's Deposition), at 90.

Hamer's years of experience as a Program Director.  Therefore, she cannot show that those reasons are merely a pretext for discrimination.

Accordingly, summary judgment is due to be entered in favor of Colonial on plaintiff's wage discrimination claims.

## VIII.  CONCLUSION AND ORDERS

Based upon the foregoing discussion, it is ORDERED that the motion for summary judgment filed by defendant, Colonial Management Group, LP, is GRANTED, and all claims asserted herein by Kimberly Haley-Muhammad are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

**DONE** and **ORDERED** this 16th day of March, 2015.

_____
United States District Judge

30